[No. 36826. Department Two. January 16, 1964.]

Isabel B. Harrison, *as Executrix, Appellant,* v. A Bar A Ranch, Inc., *Respondent.*\*

*Roy E. Jackson* and *Thor P. Ulvestad,* for appellant.

*Evans, McLaren, Lane, Powell & Moss* and *Frank W. Draper,* for respondent.

Murray, J.†—The appellant, as executrix of her husband's estate, wages this action for damages for (a) his pain and suffering and (b) wrongful death. Martin V. Harrison was hired as captain of a yacht owned by the respondent. He was in the process of changing the engine oil when an explosion and flash fire occurred, which caused his death. The jury returned a verdict for the defendant.

The accident occurred June 22, 1960, aboard respondent's 58-foot craft, the MV *Sapphire Sea,* which was powered by a Caterpillar DC-377 diesel marine engine. The vessel was built by Blanchard Boat Works in Seattle and was launched in May, 1959, and since then has been operated by the re-

\*Reported in 388 P. (2d) 531.

†Judge Murray is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

spondent for charter in Pacific Coast waters. The diesel engine was activated electrically by current transmitted from one of two storage batteries through an insulated power cable to the solenoid. The solenoid functioned to turn over the starter motor which, in turn, started the main engine. At the end of the power cable, there was a flange which fitted over a bolt on the solenoid and was secured by a nut. The copper flange, nut and bolt were not insulated by the manufacturer of the engine. This uninsulated terminal connection was in accordance with standard marine construction in this area.

The solenoid was located on the starboard side of the engine close to and somewhat back of the lube oil filter case, which contained replaceable filters and which itself was drained by removing a plug at the base thereof. A copper fuel line ran from the cooler pot in a horizontal path at the same approximate level of and about 6 inches from the solenoid.

The vessel had a battery disconnect switch located in the engine room. This switch turned to the "off" position would prevent the flow of electrical current from the battery through the power cable leading to the solenoid. When off, there was no way in which current could be shorted from the solenoid terminal to the copper fuel line or other metal object. The evidence showed that a battery disconnect switch was in standard use aboard vessels of this type in the area, and the purpose thereof was to render inactive the engine's electrical apparatus while persons were working on the engine.

The vessel was equipped with two 32-volt batteries. One provided electrical energy for the engine as above described; the other supplied power for the vessel's lights and miscellaneous equipment. When the battery disconnect switch was off, it removed current from the power cable leading to the solenoid, but had no effect on the other electrical apparatus aboard the vessel.

The evidence shows that the engine area was quite small. The engine itself was approximately 5 to 6 feet in length and 3 to 4 feet in height. A person in the engine area

could not stand erect, and the headroom decreased substantially as one proceeded aft, so that, at the after end of the engine, it was necessary to assume a crouched position. The aisleways or walkways on either side of the engine were quite narrow and to move on either side of the engine, one had to turn sideways. Entry to the engine room was through a doorway approximately 2½ feet wide on the port side, forward. There were no portholes in the engine area. In the engine area, there were four ceiling lights, two fore and two aft. The lights were on at the time of the accident.

The marine gear filter, a permanent metal strainer, was contained in a cylindrical steel case located at the after end of the engine toward the port side.

Mr. Harrison was experienced in handling marine craft; had taken courses in navigation in 1944, 1956 and 1958. He had been employed at Bryant's Marina in Seattle and elsewhere as a shipwright, at which occupation he displayed notable skill. In 1948, he had been employed as master of a 107-foot Army tug in Alaska waters. After a rigid examination by the United States Coast Guard, he was licensed to operate vessels up to 60 tons, and for ocean travel up to 20 miles off shore. Further, he was also experienced as a marine engineer. Mr. Harrison had completed 2 years at the University of Washington, and according to the evidence, possessed unusual intelligence.

The voyage, which began June 10, 1960, was planned as a pleasure cruise by Mr. and Mrs. Anderson, owners of the respondent corporation. The route was to be Seattle to Juneau, Alaska, via the Inland Passage. Aboard, in addition to Mr. and Mrs. Anderson and Mr. Harrison, was a 19-year-old university student, Charles Dick, who signed on for the voyage. His duties were to be general helper and deck hand, and to assist Mrs. Anderson in the galley and perform miscellaneous housekeeping chores. Mr. Dick had no experience with diesel engines and, prior to the day of the accident, had been in the engine area only for the purpose of hanging up dish towels.

The *Sapphire Sea* arrived and tied up to a float at Belle Island, Alaska, on June 21, 1960. On the afternoon of June

22nd, Mr. Anderson instructed Mr. Dick to report to Mr. Harrison in the engine room, to give him whatever assistance he required. When Mr. Dick entered the engine room, Mr. Harrison was on the port side, aft of the engine, in the process of changing engine oil. Mr. Harrison instructed Mr. Dick to take ashore the oil he had pumped from the engine and dump it in the bushes. When Mr. Dick returned from dumping the oil, Mr. Harrison handed him a mop bucket containing the marine gear filter, a metal screen-like object, and instructed him to clean the filter in gasoline. Mr. Dick took the bucket and the contents to a shack on the float. He then returned to the vessel and filled a 1-pound coffee can with gasoline from a storage container located in the false stack, and returned to the float, poured the gasoline over the filter and cleaned it. He believed the filter needed further cleaning and drew an additional half-can full of gasoline and repeated the process, this time, however, catching all or part of the gasoline in the mop bucket.

It was raining at the time, and, on finishing the cleaning operation, Mr. Dick covered the mop bucket with a cardboard box containing the filter and carried the bucket and coffee can back to the engine room. When he reentered the engine area through the forward doorway, Mr. Harrison was still pumping the main engine oil at the after end, port side of the engine. Mr. Dick placed the coffee can on a work bench to the right of the doorway and placed the covered bucket containing the filter on the deck in front of him. Mr. Harrison came forward, examined the filter, said it was fine, and replaced it in the mop bucket. Mr. Harrison then told Mr. Dick to finish pumping the main engine oil. Mr. Harrison took the filter and the bucket and reinstalled the marine gear filter. In so doing, he could have gotten gasoline on his hands and clothing because of the cramped quarters. Mr. Dick continued pumping oil from the engine as directed. He filled and dumped one can ashore and had returned and filled it again and started forward, intending to go  topside and remove the filled container through the hatch. Mr. Harrison was at work on the starboard side of the engine at that time. As he proceeded for-

ward, Mr. Dick heard a "click" and a "whoosh" and a sheet of flame shot around the forward part of the engine from the starboard side.

Mr. Harrison's clothing was ablaze and he was severely burned. He died therefrom 17 days later.

Shortly after the accident, it was discovered that oil was leaking from the copper fuel line on the starboard side of the engine, which had ruptured in the area where it passed the solenoid. The copper tubing showed evidence of a burn such as would be produced by an arcing electrical current. Mr. Dick also observed at that time a coffee can, possibly the same one used by him in cleaning the marine gear filter, located between the water cooling pipes on the starboard side of the engine. The can was in proximity to the area of the ruptured fuel line. When Mr. Dick attempted to remove the coffee can, there was an arcing of electrical current—a short between the solenoid and the copper fuel line—across the coffee can. Inspection of the coffee can thereafter revealed burn marks thereon such as would be caused by an arcing electrical current, and there were bits of metal from the coffee can embedded in the copper fuel line. In addition, there was a nick or burn spot on the copper flange at the solenoid end of the electrical power cable.

Mr. Dick also observed at that time that the drain plug on the oil lube filter case, located generally above the coffee can, had been loosened. The bucket in which the marine gear filter had been returned to the engine area by Mr. Dick was lying on its side at the forward end of the engine on the starboard side.

There was expert testimony that gas fumes, when mixed with air, create the potential of an explosion and a large quantity of gasoline was not necessary to produce such a condition in a relatively small, unventilated area.

There was further expert testimony that it was not a reasonably safe practice to use gasoline to clean engine parts, such as the marine gear filter, and that diesel oil, which was in abundant supply aboard the vessel, should have been used.

Appellant's experts testified that if gasoline were used to clean a marine gear filter, it would be possible for the filter to trap a sufficient quantity of liquid gas to subsequently create a dangerous condition in the engine area. There was testimony that a coffee can which had been used to pour gasoline would create a similar hazard, due to the fumes that would be given off for some time after the can was emptied of liquid gasoline, and that such would also be true of a mop bucket into which a quantity of gasoline had been poured, even if no liquid gas were in the bucket when it was returned to the engine area.

There was substantial evidence that whatever danger was present in the engine area at the time of the accident resulted from a combination of gas fumes and the potential of such being ignited due to a shorting caused by someone placing a metal object, such as a coffee can or tool, in contact with the solenoid terminal. Also there was testimony that there would be no danger from such sources if the battery disconnect switch had been turned off before Mr. Harrison started working in the solenoid area.

The operation being performed by Mr. Harrison at the time of the accident—draining the lube oil filter case—was routine engine maintenance which was customarily accomplished aboard the *Sapphire Sea* every 250 hours, or approximately five times prior to June 22, 1960.

The jury returned a verdict for the respondent.

The appellant presents six assignments of error directed to the instructions Nos. 14, 17, 18, 19 and 23. Assignments of error Nos. 1 and 3 are directed to instruction No. 18 which was as follows:

"Plaintiff has alleged that the defendant was negligent in failing to provide the deceased with a safe place to work. You are instructed in this connection that the defendant would not be negligent merely because there may have been an unsafe condition in the vessel's engine room. Before you can find the defendant guilty of negligence you must first find that the defendant either knew of the existence of such unsafe condition or that such condition had existed for such a length of time that the defendant should have known of such. You are further instructed in this regard

that the defendant would not be negligent if the unsafe condition, if any, in the engine room was caused by the manner in which the deceased was performing his work rather than by the condition of the vessel or its equipment. The plaintiff cannot recover if deceased's injuries and death were caused by a condition which was created by deceased's own inattention or carelessness."

The meaningful portion of the exception taken was as follows:

"With reference to No. 18 I would except and I do except on behalf of the plaintiff, the next to last sentence wherein they would be told that the defendant would not be negligent if the unsafe condition, if any, in the engine room was caused by the manner in which the deceased was performing his work rather than by the condition of the vessel and its equipment. . . .

"I also except on behalf of the plaintiff to the last sentence wherein they would be told that the plaintiff cannot recover if the deceased's injuries and death were caused by a condition which was created by the deceased's own inattention and carelessness. . . ."

Appellant argues that the instruction was erroneous for a number of reasons: it denies to the appellant the protection available to her under her first cause of action for personal injuries which were suffered by Mr. Harrison prior to his death, as preserved to appellant under RCW 4.20.060, since those injuries would be compensable under the Jones Act, as well as for unseaworthiness under the General Maritime Law; also that instruction No. 18 was inconsistent with instructions Nos. 10, 11, and 13; that the court commented on the evidence particularly in using the word "merely."

There seems to be a misconception of the basis upon which appellant may recover damages. The appellant is not entitled to recover either for decedent's alleged pain and suffering or alleged wrongful death predicated solely on the alleged unseaworthiness of the vessel. Under the General Maritime Law, prior to the Jones Act, 46 U.S.C.A. § 688, an injured seaman could himself recover for injuries caused by the unseaworthiness of his employer's vessel, but such right of action did not survive his death. *Cortes v. Balti-*

*more Insular Line,* 287 U. S. 367, 77 L. Ed. 368, 53 S. Ct. 173; *Decker v. Moore-McCormack Lines, Inc.,* 91 F. Supp. 560; *Holland v. Steag, Inc.,* 143 F. Supp. 203.

There was no right of action provided for wrongful death under the general maritime law. *The Harrisburg,* 119 U. S. 199, 30 L. Ed. 358, 7 S. Ct. 140.

▊ Under the Jones Act, 46 U.S.C.A. § 688, the personal representative of a deceased seaman can maintain an action for wrongful death and for personal injuries resulting in such death. However, the rights of recovery which the Jones Act confers are those predicated on negligence. It provides no remedy to the personal representative of the deceased seaman for injuries or death caused by the un-seaworthiness where employer is without negligence. *Lindgren v. United States,* 281 U. S. 38, 48, 74 L. Ed. 686, 50 S. Ct. 207, states the rule as follows:

". . . to recover damages for the seaman's death when caused by negligence, for and on behalf of designated bene-ficiaries, is necessarily exclusive and precludes the right of recovery of indemnity for his death by reason of unsea-worthiness of the vessel, irrespective of negligence, which cannot be eked out by resort to the death statute of the State in which the injury was received."

The Congress, by passage of the Jones Act, preempted the field and provided the exclusive remedy available to the personal representative of a deceased seaman against his employer. Therefore, the state wrongful death or sur-vival statutes are not operative to provide a remedy. *Lindgren v. United States, supra.*

This has been followed in *Bath v. Sargent Line Corp.,* 166 F. Supp. 311; *Kunschman v. United States,* 54 F. (2d) 987; Gilmore and Black Jr., The Law of Admiralty, ch. 6, § 6-28, p. 302.

Appellant complains of instruction No. 18 as being in-consistent with instructions Nos. 10, 11 and 13. It must be noted that the exceptions taken were to the last two sen-tences of No. 18. Furthermore, Nos. 10, 11 and 13 were given at the request of appellant, were not excepted to be-fore the trial court, were not set out in full in appellant's

brief, and cannot be considered by this court. Appellant also objects to the use of the word "merely" which appears in the second sentence of No. 18, but no exception was made thereto.

▉ The rules require that to preserve a claimed error in an instruction given or refused, the party must point out with particularity to the trial court the basis for the exception. *Easton v. Chaffee,* 16 Wn. (2d) 183, 132 P. (2d) 1006; Rule of Pleading, Practice and Procedure 51.16W.

The portion of the instruction to which no exception has been taken becomes the law of the case. *Peterson v. King Cy.,* 45 Wn. (2d) 860, 278 P. (2d) 774; *Barnes v. Labor Hall Ass'n, Inc.,* 51 Wn. (2d) 421, 319 P. (2d) 554.

This court is limited by the exceptions taken to No. 18. They pointed to the last two sentences which said, in effect, that plaintiff could not recover if the unsafe condition in the engine area "was caused by the manner in which the deceased was performing his work rather than by the condition of the vessel or its equipment" or "if the deceased's injuries and death were caused by a condition which was created by deceased's own inattention or carelessness."

The sentences complained of were clear, were correct statements of the law, and we find no error.

Appellant's assignments of error Nos. 2, 5 and 6 are directed to three instructions numbered 17, 19 and 23 on the ground that, respectively, they were confusing, incorrect statements of law, and prejudicial. These three instructions dealt primarily with the question of contributory negligence on the part of Mr. Harrison, and no purpose would be served in setting them out in this opinion, because a special interrogatory was submitted to the jury as follows:

"1. Was the defendant negligent? (If your answer to this interrogatory is "no", you shall not complete the remaining interrogatories but shall return a verdict for the defendant.)"

The jury answered "No" and never reached the question of contributory negligence, and instructions on that point became unimportant.

Appellant's assignment of error No. 4 complains of instruction No. 14. We have considered this instruction and find it to be a correct statement of the applicable law.

We have considered the objections made to the court's instructions which were the only items referred to in the assignments of error. We are satisfied that there was no prejudicial error. The case was submitted to the jury on the basis of negligence and contributory negligence and the rule of comparative negligence. The jury found for respondent.

The judgment is affirmed.

OTT, C. J., DONWORTH, FINLEY, and HAMILTON, JJ., concur.